(104 So. 200)

No. 26948.

## TYLER v. HARMON.

(March 2, 1925. Rehearing Denied April 27, 1925.)

*(Syllabus by Editorial Staff.)*

1. **Statutes** &#x25A0;&#x2014;120(3)—**Title of act relative to negro and white communities in municipalities held sufficiently indicative of object.**

Title of Act No. 118 of 1924, "relative to negro and white communities in municipalities" *held* sufficiently indicative of its object and not violative of Const. art. 3, § 16.

2. **Constitutional law** &#x25A0;&#x2014;215—**Ordinance forbidding establishment of residences by whites or negroes in certain communities without consent held valid.**

Ordinance of New Orleans prohibiting whites and negroes from establishing residences in certain districts without consent, enacted under authority of Act No. 117 of 1912, and Act No. 118 of 1924, *held* not violative of Const. U. S. Amend. 14, or Act April 9, 1866, § 1 (Comp. St. 1916, § 3931), or Act May 31, 1870, § 16 (Comp. St. 1916, § 3925); not being actual race discrimination in civil or political rights, but being social distinction merely, and an exercise of police power.

3. **Constitutional law** &#x25A0;&#x2014;89(1) — **Ordinance creating negro and white districts, merely zoning ordinance.**

Ordinance forbidding establishment of residences by whites or negroes in certain districts without consent, *held* merely zoning ordinance, and not unconstitutional restriction on freedom of contract, and within police power of municipality to restrict right of person to dispose of property in certain way.

Appeal from Civil District Court, Parish of Orleans; H. C. Cage, Judge.

Action by Joseph W. Tyler against Benjamin Harmon. Judgment for defendant, and plaintiff appeals. Judgment annulled, and case remanded.

Walter Winn Wright, of New Orleans, for appellant.

Ivy G. Kittredge, City Atty., of New Orleans, amicus curiæ.

Loys Charbonnet, F. F. Teissier, and F. B. Smith, all of New Orleans, for appellee.

O'NIELL, C. J. The question in this case is whether an ordinance of the city of New Orleans, providing for segregation of the residences of white and colored persons, violates the Fourteenth Amendment of the Constitution of the United States.

The ordinance is numbered 8037 and is in seven sections. The first section forbids the city engineer to issue a building permit for the construction of a residence for a negro in a "white community" or for a white person in a "negro community," without the written consent of a majority of the persons of the opposite race inhabiting the "community, or portion of the city to be affected."

The second section of the ordinance makes it unlawful for any white person to establish

his home or residence in a negro community, or portion of the city inhabited principally by negroes, or for any negro to establish his home or residence in a white community, or portion of the city inhabited principally by white people, "except on the written consent of a majority of the persons of the opposite race inhabiting such community, or portion of the city to be affected."

The third section makes it unlawful for any person to maintain a home or residence established in violation of the second section.

The fourth section makes each seven days' maintenance of a home or residence established in violation of the second section a separate and distinct offense.

The fifth section defines the terms "white community" and "negro community" as meaning and including "every residence fronting on either side of any street within 300 feet from the location of the property involved, measured along the middle of the street in any and all directions."

The sixth section fixes the penalty for any violation of the ordinance, which is a fine not exceeding $25, or imprisonment for a term not exceeding 30 days, or both fine and imprisonment within those limits, and in the discretion of the court.

The seventh section declares that, if any of the provisions of the ordinance should be held invalid, the invalidity shall not affect any other of its provisions.

In a preamble to the ordinance, it is said to be enacted to foster a separation of the white and negro residence communities, "in the interest of public peace and welfare"; and it is declared that the ordinance is enacted under authority of the Act 117 of 1912, and pursuant to the Act 118 of 1924.

The Act 117 of 1912, according to its title and in its text, purports to confer upon all municipalities in the state the authority to enact segregation ordinances, like the ordinance in contest.

The Act 118 of 1924 is entitled "an act relative to negro and white communities in municipalities having a population of more than 25,000." The statute makes it unlawful, in such municipalities, for any white person to establish his residence on any property located in a negro community without the written consent of a majority of the negroes inhabiting the community, or for any negro to establish his residence on any property located in a white community without the written consent of a majority of the white persons inhabiting the community. The written consent must be filed with the mayor of the municipality. The terms "white community" and "negro community" are defined in the statute exactly as they are defined in the ordinance in contest; and, like the ordinance, the statute makes each seven days' residence in violation of the law a separate and distinct offense.

The plaintiff in this case alleges that he is a citizen and taxpayer in New Orleans, owning real estate on the lower side of Audubon street, between Magazine street and Meadow street, in what is known as a white community, inhabited principally by white people. He alleges that the defendant owns a single cottage on the other side of Audubon street, in the same block, and within 300 feet from his lot; and that defendant is converting his cottage into a double cottage, intending to rent one side or apartment to negro tenants, without having obtained the written consent of a majority of the white persons inhabiting the aforesaid "white community."

Plaintiff prayed for a rule upon the defendant to show cause why he should not be enjoined and restrained from converting his cottage into an apartment for negro tenants, and particularly from renting the apartment for a home or residence for negro tenants, without having obtained the consent or permission required by the Ordinance No. 8037,

by the Act 117 of 1912, and by the Act 118 of 1924.

Answering the rule, the defendant averred that he was a citizen of the United States, and pleaded:

(1) That plaintiff's petition did not disclose a cause or right of action.

(2) That the Act 118 of 1924 was unconstitutional, being violative of section 16 of article 3 of the Constitution of the state, requiring that every statute shall have a title indicative of its object.

(3) That the Act 117 of 1912, the Act 118 of 1924 and the Ordinance No. 8037 were all violative of the Fourteenth Amendment of the Constitution of the United States, in that they sought to deprive this defendant of his property without due process of law, by attempting to deprive him of the right to lease it to a constitutionally qualified person, on the sole ground of race or color.

The civil district court sustained the plea that the Ordinance No. 8037 and the Acts of 1912 and 1924 violated the Fourteenth Amendment; and the court therefore dismissed the suit. The plaintiff has appealed; and the defendant, answering the appeal, pleads again (1st) that the petition of the plaintiff does not disclose a cause or right of action, and (2d) that the Act 118 of 1924 is violative of section 16 of article 3 of the Constitution of Louisiana.

The plea that the petition of the plaintiff does not disclose a cause or right of action is founded only upon the fact that plaintiff did not allege that the city engineer had not actually issued a building permit for the conversion of the defendant's single cottage into a double cottage to be occupied in part by negro tenants. It is argued on behalf of the defendant that, if the city engineer did issue the building permit—which is not denied in plaintiff's petition—there would be no violation of the law, because the Act 117 of 1912 prescribes a penalty only for the offense of building or constructing a residence for a white person in a negro community or for a negro in a white community, without a permit from the municipality. The statute seems to be bungled in so far as it prescribes the penalty for a violation of it, because, in other respects, it does not purport to make it an offense to establish a residence for a white person in a negro community or for a negro in a white community, but merely authorizes the municipalities to withhold permits for such establishments. But that is a matter of no importance here, for the statute gives to the commission council of the city of New Orleans the authority to enact such ordinance as the one on which this suit is founded. That is not disputed by the learned counsel for defendant. Nor is it disputed that plaintiff has a remedy by injunction if the Ordinance No. 8037 is valid.

[1] With regard to the plea that the Act 118 of 1924 is violative of section 16 of article 3 of the Constitution of the state, requiring that every statute shall have a title indicative of its object, our opinion is that the title of this statute is sufficient. But that also is a matter of little or no importance in this case, because, if the statute were unconstitutional for the reason stated, the plaintiff would yet have his remedy under the Ordinance No. 8037, if it is valid.

[2] The only question, therefore, is whether the statutes and the ordinance are forbidden by the Fourteenth Amendment and the appropriate legislation which the Congress has enacted to enforce the amendment. We refer, of course, to section 1 of the Act of April 9, 1866, entitled "An act to protect all persons in the United States in their civil rights, and furnish the means of their vindication" (14 Stat. at L., c. 31, p. 27; Comp. Stat. 1916, § 3931), and section 16 of the Act of May 31, 1870, entitled "an act to enforce the right of citizens of the United States to vote in the several states of this Union, and for other purposes" (16 Stat. at L., c. 114, p. 144; Comp. Stat. § 3925).

What the Fourteenth Amendment did for

the colored people in the United States was to give them citizenship and its privileges, to forbid the states to withhold from them the equal protection of the laws, and thus to prevent any discrimination against them, with regard to their political and civil rights, because of their color. The language in that respect is that all persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the state wherein they reside; that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, or deprive any person of life, liberty, or property without due process of law, or deny to any person within its jurisdiction the equal protection of the laws.

Of the several acts of Congress, enacted under the direction to enforce the provisions of the amendment by appropriate legislation, only the first section of the Act of April 9, 1866 (14 Stat. at L., c. 31, p. 27, Comp. Stat. § 3931), and the sixteenth section of the Act of May 31, 1870 (16 Stat. at L., c. 114, p. 144, Comp. Stat. § 3925), are pertinent to this discussion.

The first section of the Act of 1866, as far as the colored citizens of the United States are concerned, merely guarantees that they—

"shall have the same right, in every state and territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."

The sixteenth section of the Act of 1870, also, guarantees nothing more than equal civil and political rights, viz.:

"That all persons within the jurisdiction of the United States shall have the same right in every state and territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding."

There is nothing in either the Fourteenth Amendment or the Acts of Congress suggestive of social equality between the white race and the colored race, or forbidding the states to discourage amalgamation or social intercourse between the white and the colored race.

Even in the strong and passionate appeal of Justice Harlan, in defense of the negroes' constitutional rights, in his dissenting opinion in Plessy v. Ferguson, 163 U. S. 552–563, 16 S. Ct. 1144, 41 L. Ed. 261–265, it was not denied that the Fourteenth Amendment and the Acts of 1866 and 1870 dealt only with civil and political rights, and had nothing to do with the matter of social equality. In that case, the Supreme Court of the United States declared that a statute of Louisiana requiring railroad companies to provide separate coaches for white and colored passengers, and making it a crime for a white person to ride in a coach provided for colored passengers, or for a colored person to ride in a coach provided for white passengers (Act 111 of 1890, p. 152), was not violative of any provision in the Fourteenth Amendment or Acts of Congress. Justice Harlan's dissent was founded, as we understand it, not upon the idea that the statute withheld from the colored passengers any civil or political right that was allowed to white passengers, nor upon the theory that the Fourteenth Amendment guaranteed social equality, but upon the theory that the right of a white person and a colored person to ride together in the same passenger coach was one of those personal privileges which no government, proceeding alone on

the ground of race, could take away from them, without infringing upon the personal liberty of each of them. We quote from the dissenting opinion all that touches upon those ideas, viz.:

"However apparent the injustice of such legislation may be, we have only to consider whether it is consistent with the Constitution of the United States. * * *

"In respect to civil rights, common to all citizens, the Constitution of the United States does not, I think, permit any public authority to know the race of those entitled to be protected in the enjoyment of such rights. 'Every true man has pride of race, and under appropriate circumstances, when the rights of others, his equals before the law, are not to be affected, it is his privilege to express such pride and to take such action based upon it as to him seems proper. * * *

"If a white man and a black man choose to occupy the same public conveyance on a public highway, it is their right to do so, and no government, proceeding alone on grounds of race, can prevent it without infringing the personal liberty of each. * * *

"A statute may be unreasonable merely because a sound public policy forbade its enactment. But I do not understand that the courts have anything to do with the policy or expediency of legislation. A statute may be valid, and yet, upon grounds of public policy, may well be characterized as unreasonable. * * *

"If the power exists to enact a statute, that ends the matter so far as the courts are concerned. * * *

"In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved. * * *

"This question is not met by the suggestion that social equality cannot exist between the white and black races in this country. That argument, if it can be properly regarded as one, is scarcely worthy of consideration; for social equality no more exists between two races when traveling in a passenger coach on a public highway than when members of the same races sit by each other in a street car or in the jury box, or stand or sit with each other in a political assembly, or when they use in common the streets of a city or town, or when they are in the same room for the purpose of having their names placed on the registry of voters, or when they approach the ballot box in order to exercise the high privilege of voting. * * *

"We boast of the freedom enjoyed by our people above all other peoples. But it is difficult to reconcile that boast with a state of the law which, practically, puts the brand of servitude and degradation upon a large class of our fellow citizens, our equals before the law. The thin disguise of 'equal' accommodations for passengers in railroad coaches will not mislead anyone, nor atone for the wrong this day done."

We have quoted Justice Harlan's dissenting opinion in Plessy v. Ferguson because it is the strongest argument against this kind of legislation that we have ever read. We are convinced, though, and we suppose that the majority of the Justices of the Supreme Court of the United States were convinced in the case cited, that the opposition to such legislation as this is not founded upon the idea of any actual discrimination against the colored race in the matter of any civil or political right, but is founded upon the idea that such legislation is not within the police power of the states—that the right of a white person to associate with a negro, or of a negro to associate with a white person, is one of those individual rights or privileges which is beyond the control of any government.

The decision of the United States Supreme Court in Plessy v. Ferguson, 163 U. S. 537, 16 S. Ct. 1138, 41 L. Ed. 256, could not be reconciled with a ruling that the statutes and ordinances in this case are unconstitutional. There is more substantial reason for the public sentiment and policy against allowing white persons and negroes to live in the same neighborhood than there is for the public sentiment and policy against allowing them to ride in the same railroad coach, on a public thoroughfare. The statutes and the ordinance in this case are as free from discrimination as was the statute that was held valid in the case of Plessy v. Ferguson. There is no discrimination whatever against either race in the statutes or in

the ordinance in contest. Colored people are denied the right to come and reside in a white neighborhood, under precisely the same conditions that white people are denied the right to go and reside in a colored neighborhood. The rights which are denied to each race are as different as the color of the races, of course, in this, that, under the same conditions, the one race is denied the right to live among white people and the other is denied the right to live among black people. But that is choplogic. The rights which are denied to each race are the same in this, that each race is, under precisely the same conditions, denied the right to live among the people of the other race. Therefore, if these statutes or this ordinance should be held invalid, the ruling could not be founded, logically or truthfully, upon a finding of discrimination against the colored race. Surely, if the statutes had been enacted by a Legislature composed mainly or entirely of colored citizens, or if the ordinance had been enacted by a municipal council composed mainly or entirely of colored citizens, we could not truthfully say that they had discriminated against the white race. The only question, therefore, is whether it is within the police power of the states to enact laws to discourage social intercourse between the white and the colored race. And that question has been answered by the decisions of the Supreme Court of the United States upholding laws requiring separate seats for colored people in street cars, or separate coaches for them on railroad trains, laws forbidding the attendance of white and colored children in the same schools, laws forbidding miscegenation, or intermarriage between white and colored people.

The best reasoning we have read upon this subject is in the majority opinion of the Supreme Court of the United States in Plessy v. Ferguson, 163 U. S. 537, 16 S. Ct. 1138, 41 L. Ed. 256, from which we take the most pertinent excerpts, viz.:

158 LA.—15

"A statute which implies merely a legal distinction between the white and colored races— a distinction which is founded in the color of the two races, and which must always exist so long as white men are distinguished from the other race by color—has no tendency to destroy the legal equality of the two races, or re-establish a state of involuntary servitude. * * *

"The object of the Fourteenth Amendment was undoubtedly to enforce the absolute equality of the two races before the law, but in the nature of things it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political, equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring their separation in places where they are liable to be brought into contact do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state Legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for white and colored children, which have been held to be a valid exercise of the legislative power even by courts of states where the political rights of the colored race have been longest and most earnestly enforced.

"One of the earliest of these cases is that of Roberts v. Boston, 5 Cush. 198, in which the Supreme Judicial Court of Massachusetts held that the general school committee of Boston had power to make provision for the instruction of colored children in separate schools established exclusively for them, and to prohibit their attendance upon the other schools. * * * Similar laws have been enacted by Congress under its general power of legislation over the District of Columbia (D. C. Rev. Stat. §§ 281–283, 310, 319), as well as by the Legislatures of many of the states, and have been generally, if not uniformly, sustained by the courts. State, Garnes, v. McCann, 21 Ohio St. 210; Lehew v. Brummell, 103 Mo. 546 (11 L. R. A. 828); Ward v. Flood, 48 Cal. 36 (17 Am. Rep. 405); Bertonneau v. Directors of City Schools, 3 Woods, 177; People v. Gallagher, 93 N. Y. 438 (45 Am. Rep. 232); Cory v. Carter, 48 Ind. 337 (17 Am. Rep. 738); Dawson v. Lee, 83 Ky. 49.

"Laws forbidding the intermarriage of the two races may be said in a technical sense to interfere with the freedom of contract, and yet have been universally recognized as within the police power of the state. State v. Gibson, 36 Ind. 389 (10 Am. Rep. 42). * * *

"Similar statutes for the separation of the two races upon public conveyances were held

to be constitutional in West Chester & P. R. Co. v. Miles, 55 Pa. 209 (93 Am. Dec. 744); Day v. Owen, 5 Mich. 520 (72 Am. Dec. 62); Chicago & N. W. R. Co. v. Williams, 55 Ill. 185 (8 Am. Rep. 641); Chesapeake, O. & S. R. Co. v. Wells, 85 Tenn. 613; Memphis & C. R. Co. v. Benson, 85 Tenn. 627; The Sue, 22 Fed. Rep. 843; Logwood v. Memphis & C. R. Co., 23 Fed. Rep. 318; McGuinn v. Forbes, 37 Fed. Rep. 639; People v. King, 110 N. Y. 418 (1 L. R. A. 293); Houck v. Southern P. R. Co., 38 Fed. Rep. 226 (4 Inters. Com. Rep. 441); Heard v. Georgia R. Co., 3 I. C. C. Rep. 111 (2 Inters. Com. Rep. 508), 1 I. C. C. Rep. 428 (1 Inters. Com. Rep. 719). * * *

"It is claimed by the plaintiff in error that, in any mixed community, the reputation of belonging to the dominant race, in this instance the white race, is property, in the same sense that a right of action, or of inheritance, is property. Conceding this to be so, for the purposes of this case, we are unable to see how this statute deprives him of, or in any way affects his right to, such property. If he be a white man and assigned to a colored coach, he may have his action for damages against the company for being deprived of his so-called property. Upon the other hand, if he be a colored man and be so assigned, he has been deprived of no property, since he is not lawfully entitled to the reputation of being a white man.

"In this connection it is also suggested by the learned counsel for the plaintiff in error that the same argument that will justify the state Legislature in requiring railways to provide separate accommodations for the two races will also authorize them to require separate cars to be provided for people whose hair is of a certain color, or who are aliens, or who belong to certain nationalities, or to enact laws to require colored people to walk upon one side of the street, and white people upon the other, or requiring white men's houses to be painted white, and colored men's black, or their vehicles or business signs to be of different colors, upon the theory that one side of the street is as good as the other, or that a house or vehicle of one color is as good as one of another color. The reply to all this is that every exercise of the police power must be reasonable, and extend only to such laws as are enacted in good faith for the promotion of the public good, and not for the annoyance or oppression of a particular class. * * *

"So far, then, as a conflict with the Fourteenth Amendment is concerned, the case reduces itself to the question whether the statute of Louisiana is a reasonable regulation, and with respect to this there must necessarily be a large discretion on the part of the Legislature. In determining the question of reasonableness it is at liberty to act with reference to the established usages, customs, and traditions of the people, and with a view to the promotion of their comfort, and the preservation of the public peace and good order. Gauged by this standard, we cannot say that a law which authorizes or even requires the separation of the two races in public conveyances is unreasonable or more obnoxious to the Fourteenth Amendment than the Acts of Congress requiring separate schools for colored children in the District of Columbia, the constitutionality of which does not seem to have been questioned, or the corresponding acts of state Legislatures.

"We consider the underlying fallacy of the plaintiff's argument to consist in the assumption that the enforced separation of the two races stamps the colored race with a badge of inferiority. If this be so, it is not by reason of anything found in the act, but solely because the colored race chooses to put that construction upon it. The argument necessarily assumes that if, as has been more than once the case, and is not unlikely to be so again, the colored race should become the dominant power in the state Legislature, and should enact a law in precisely similar terms, it would thereby relegate the white race to an inferior position. We imagine that the white race, at least, would not acquiesce in this assumption. The argument also assumes that social prejudices may be overcome by legislation, and that equal rights cannot be secured to the negro except by an enforced commingling of the two races. We cannot accept this proposition. If the two races are to meet on terms of social equality, it must be the result of natural affinities, a mutual appreciation of each other's merits and a voluntary consent of individuals. As was said by the court of appeals of New York in People v. Gallagher, 93 N. Y. 438, 448 (45 Am. Rep. 232), 'this end can neither be accomplished nor promoted by laws which conflict with the general sentiment of the community upon whom they are designed to operate. When the government, therefore, has secured to each of its citizens equal rights before the law and equal opportunities for improvement and progress, it has accomplished the end for which it is organized and performed all of the functions respecting social advantages with which it is endowed.' Legislation is powerless to eradicate racial instincts or to abolish distinctions based upon physical differences, and the attempt to do so can only result in accentuating the difficulties of the present situation. If the civil and political rights of both races be equal, one cannot be inferior to the other civilly or politically. If

one race be inferior to the other socially, the Constitution of the United States cannot put them upon the same plane. * * * "

· Booker T. Washington had the same idea when he said:

"In all things that are purely social we can be as separate as the fingers, yet one as the hand in all things essential to mutual progress."

He saw the difference between those civil and political rights, on the one hand, which the Fourteenth Amendment guarantees all men shall share equally, and the matter of social intercourse, on the other hand, which the Fourteenth Amendment has nothing to do with.

We are reminded of the ruling of the Supreme Court of the United States in Buchanan v. Warley, 245 U. S. 60, 38 S. Ct. 16, 62 L. Ed. 149; L. R. A. 1918C, 210, Ann. Cas. 1918A, 1201. The decision is relied upon by the appellee in this case, for it was upon the authority of that case that the judge of the civil district court decided this case contrary to his own judgment, which he explains in a very logical and convincing opinion.

The doctrine of the decision in Plessy v. Ferguson, supra, was not overruled in Buchanan v. Warley. On the contrary, it was cited with approval, and was affirmed, thus:

"As we have seen, this court has held laws valid which separated the races on the basis of equal accommodations in public conveyances, and courts of high authority have held enactments lawful which provide for separation in the public schools of white and colored pupils where equal privileges are given. * * *

"The defendant in error insists that Plessy v. Ferguson, 163 U. S. 537, 41 L. Ed. 256, 16 Sup. Ct. Rep. 1138, is controlling in principle in favor of the judgment of the court below. In that case this court held that a provision of a statute of Louisiana requiring railway companies carrying passengers to provide in their coaches equal but separate accommodations for the white and colored races did not run counter to the provisions of the Fourteenth Amendment. It is to be observed that in that case there was no attempt to deprive persons of color of transportation in the coaches of the public carrier, and the express requirements were for equal though separate accommodations for the white and colored races. In Plessy v. Ferguson, classification of accommodations was permitted upon the basis of equality for both races."

Although we cannot quite reconcile our judgment in the present case with all that is said in Buchanan v. Warley, the two cases may be distinguished in this, that in Buchanan v. Warley the court found, as a fact, that the ordinance of the city of Louisville, which the court declared violative of the Fourteenth Amendment, forbade a white person to sell property in a neighborhood of white persons to a colored person, and forbade a colored person to sell property in a colored neighborhood to a white person. And it was on that finding of interference with the freedom of contract that the court declared the ordinance unconstitutional. Here is what the court said on the subject:

"The right of the plaintiff in error to sell his property was directly involved and necessarily impaired because it was held in effect that he could not sell the lot to a person of color who was willing and ready to acquire the property, and had obligated himself to take it. * * *

"In effect, premises situated as are those in question in the so-called white block are effectively debarred from sale to persons of color, because if sold they cannot be occupied by the purchaser nor by him sold to another of the same color. * * *

"The question now presented makes it pertinent to inquire into the constitutional right of the white man to sell his property to a colored man, having in view the legal status of the purchaser and occupant. * * *

"In the face of these constitutional and statutory provisions, can a white man be denied, consistently with due process of law, the right to dispose of his property to a purchaser by prohibiting the occupation of it for the sole reason that the purchaser is a person of color intending to occupy the premises as a place of residence? * * *

"These enactments [Acts of 1866 and 1870] did not deal with the social rights of men, but with those fundamental rights in property which it was intended to secure upon the same terms to citizens of every race and color. * * *

"The case presented does not deal with an

attempt to prohibit the amalgamation of the races. The right which the ordinance annulled was the civil right of a white man to dispose of his property if he saw fit to do so to a person of color and of a colored person to make such disposition to a white person. * * * "

Those reasons, for which the ordinance of the city of Louisville was declared unconstitutional, are not pertinent to the statutes of Louisiana or the ordinance of the city of New Orleans, which we have before us. There is nothing in either of the statutes or in the ordinance forbidding a white man to sell his property to a colored man, or forbidding a colored man to sell to a white man in any community or neighborhood. And it may be conceded—though the issue is not before us—that a white man owning property in a colored neighborhood before the enactment of the statutes or the ordinance, or a colored man owning property in a white neighborhood before the enactment of the statutes or the ordinance, might have the right to move into it and reside there. That question—whether the right of an owner of a residence to go and reside in it is one of those vested rights which cannot be divested or affected by legislation of this character—is not involved in this case, and must not mislead us. But, if a white man buys or takes a lease upon property in a colored neighborhood, or if a colored man buys or takes a lease upon property in a white neighborhood, knowing that the law of the state or city puts certain restrictions upon his right to reside in the neighborhood, he has no right to complain, or to charge that there is discrimination against him because of his color.

Justice Harlan, in his dissenting opinion, which we have quoted, struck the keynote of the argument against these segregation laws, when he said:

"If a white man and a black man choose to occupy the same public conveyance on a public highway, it is their right to do so, and no government, proceeding alone on grounds of race, can prevent it without infringing the personal liberty of each."

That principle, so strongly insisted upon by Justice Harlan, is one that cannot and should not be denied in its proper sphere. It found apt lodgment in Buchanan v. Warley, as soon as the court found that freedom of contract was unduly impinged upon. On the other hand, freedom of contract is not paramount. It is no argument at all against a legitimate police measure to say that it denies, or leads to a denial of, personal liberty and freedom of contract. That is what Buchanan v. Warley said against Louisville's segregation ordinance; but that is not enough to condemn a police regulation of reasonable benefit or necessity. Liberty ends where the rights of others begin. It ends where the safety or the happiness or the welfare of others begins. That is not a mere dictum of gendarmerie. It is not a mere pretext of racial hostility. It is the oldest and most universal of laws, fundamental in all statutes and Constitutions, and paramount in all lands, that the one must be effaced for the sake of the many. Where the many are to be benefited or saved, the via crucis, for the one, is not an act of generous sacrifice; it is an inescapable duty. Personal liberty and freedom of contract have an appealing, almost peremptory sound. They may carry us too far, as we are reminded by the pathetic cry of Madame Roland, as she ascended the scaffold, "Oh, Liberty, how many crimes are committed in thy name!"—a cry in which there is wisdom as well as pathos and in which there is even more, in the way of a beacon light for safe judicial guidance, than there is of transcendent poetic imagery.

Justice Harlan's argument, though, we say with great respect, was founded, in some measure, upon decisions which were not pertinent to the case of Plessy v. Ferguson, or Buchanan v. Warley, and which would not be pertinent to this case. We refer to

the decisions maintaining that the states could not legislate against the right of colored men to serve on juries, on account of their race or color. Justice Harlan quoted from those decisions, viz.: Strauder v. West Virginia, 100 U. S. 303, 25 L. Ed. 664, 665; Ex parte Virginia (Virginia v. Rives), 100 U. S. 513, 25 L. Ed. 667; Ex parte Virginia, 100 U. S. 339, 25 L. Ed. 676; Neal v. Delaware, 103 U. S. 370. 26 L. Ed. 567; Bush v. Kentucky, 107 U. S. 110, 1 S. Ct. 625, 27 L. Ed. 354. The ruling in each of those cases was founded upon an act of Congress which was appropriate to them, but not to Plessy v. Ferguson, or Buchanan v. Warley, viz., the act of March 1, 1875 (18 Stat. at L. 336, U. S. Comp. St. § 3929), which provides:

"That no citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any state, on account of race, color, or previous condition of servitude."

That, of course, has nothing to do with the matter of social equality between the races, or with the question of constitutionality or validity of a statute tending to keep the races apart—when they are not serving on juries.

Strange to say—and we say it with great respect—the author of the opinion in Buchanan v. Warley also quoted at length from Strauder v. West Virginia, 100 U. S. 303, 25 L. Ed. 664, and Ex parte Virginia, 100 U. S. 339, 25 L. Ed. 676, in which, the rulings, as we have said, were founded only upon the Act of March 1, 1875, and are therefore not at all pertinent to the case before us.

[3] These statutes of Louisiana, and this ordinance of the city of New Orleans, do not forbid a white man to sell his property in a white neighborhood to a negro who intends to reside in it, or forbid a negro to sell his property in a negro neighborhood to a white man who intends to reside in it. The stat-utes and the ordinance merely forbid the purchaser in either case to carry out his intention, without the consent of a majority of the citizens of the other race residing in the neighborhood. To say that such a law takes away the freedom of contract would be the same as to say that the so-called zoning ordinances—by which, in many cities, business establishments are forbidden in residence districts—take away the freedom of contract because they forbid an owner of property in such district to sell it to a grocer who is willing and ready to buy it only on condition that he may use it for his grocery store. The police power of municipalities to restrict the right of a person to dispose of his property in that way, by a so-called zoning ordinance, is not now an open question. Welch v. Swasey, 214 U. S. 91, 29 S. Ct. 567, 53 L. Ed. 923; Hadacheck v. Los Angeles, 239 U. S. 394, 36 S. Ct. 143, 60 L. Ed. 348, Ann. Cas. 1917B, 927; Cusack v. Chicago, 242 U. S. 529, 37 S. Ct. 190, 61 L. Ed. 472, L. R. A. 1918A, 136, Ann. Cas. 1917C, 594; St. Louis Poster Co. v. St. Louis, 249 U. S. 269, 39 S. Ct. 274, 63 L. Ed. 599.

The segregation ordinance, in contest, is only another kind of zoning ordinance. And since it is well settled by the ruling in Plessy v. Ferguson that the drawing of the color line does not make the law discriminative, or violate the Fourteenth Amendment, and that the purpose to be accomplished is within the police power, our conclusion is that the statutes and the ordinance are valid.

The injunction sought by the plaintiff in this case is not merely to stop the defendant's converting his single cottage into a double cottage. If the ordinance did not forbid the reconstruction of the house without a permit from the city engineer, on the consent of a majority of the property owners in the neighborhood or community, there would be no merit whatever in the plaintiff's demand for an injunction in that respect. And it may be that the civil district court will be justified

in refusing the injunction to that extent when the defendant has answered the rule to show cause why an injunction should not issue. As the case is presented, and for the purpose of this decision, it is conceded that the defendant is converting his cottage into a double cottage for the purpose of renting one side or apartment to negro tenants and is actually going to rent it to negro tenants unless he is forbidden by the statutes or the ordinance in question. The record does not inform us whether the defendant is a white man or a colored man, or whether he resides in his cottage or elsewhere in the "white community" or outside of the community; all of which are questions of no importance to our decision of the question of constitutionality of the statutes and ordinance in contest. The learned counsel for the defendant frankly state that they desire not to evade the issue as to whether the statutes and the ordinance are valid in so far as they forbid negro tenants to occupy the defendant's cottage. Our conclusion is that the statutes and the ordinance in that respect are valid.

The judgment is annulled and it is ordered that the case be remanded to the civil district court for further proceedings consistent with the foregoing opinion. The defendant is to pay the costs of this appeal. All other court costs are to depend upon the final judgment.

ST. PAUL, J. (concurring). I concur in the opinion of the Chief Justice, who has so clearly brought out that the ordinance complained of contains no discrimination whatever against any one on account of race or color. In effect, the ordinance provides merely that no person of *either race* shall establish his residence in a section already occupied by a majority of the other race, without the consent of [a majority of] such majority. Hence equal *restrictions* are placed upon persons of *both* races, and equal *rights* (of exclusion) given to the majority residing in a section whether they be of the one race or of the other.

### I.

The ordinance therefore operates *equally* upon *all* owners of property, whether white or black. For the owners of property in a white section, whether white or black, are equally forbidden to let it be occupied by negroes, and *per contra* are equally permitted to have it occupied by whites; and the owners of property in a negro section, whether white or black, are equally forbidden to let it be occupied by whites, and *per contra* equally permitted to let it be occupied by negroes.

So that the sum and substance of the ordinance is, that property in a white section, by whomsoever owned (whether white or black), shall not be occupied by negroes; and property in a negro section, by whomsoever owned (whether black or white), shall not be occupied by whites.

Clearly, therefore, the ordinance discriminates neither against a white owner nor against a negro owner; for it clearly permits to the one what it permits to the other, and forbids to this one what it forbids to that one. In other words, the ordinance simply restricts the *use* to which certain property may be put; thus, property in a white section may be used only for housing white persons, and may *not* be used for housing negroes; and property in a negro section may be used only for housing negroes and may *not* be used for housing whites; all regardless of who may *own* it, be he white or be he black.

In State ex rel. Civello v. City of New Orleans, 154 La. 271, 283, 97 So. 440, 444 (33 A. L. R. 260) this court said, citing ample authority:

"Due process of law and the equal protection of the laws are had when the laws affect alike all persons similarly situated. * * *
"An ordinance that forbids any and every citizen to conduct any business establishment

in a designated residence district does not discriminate arbitrarily against persons owning property in the district. The ordinance affects alike all persons similarly situated. In fact, it affects absolutely every one alike, in that the same privilege is denied to any and every one."

## II.

Accordingly the only question which can arise herein is, does such a restriction upon the *use* of property *deprive* an owner of his property (with or) without due process of law. And the only answer to that is that *it does not.*

In State ex rel. Civello v. City of New Orleans, 154 La. 271, 285, 97 So. 440, 445 (33 A. L. R. 260), this court said again:

"The Supreme Court of the United States has decided * * * that a municipal government may, for the general welfare, exercise the police power to the extent of forbidding the owners of property in a designated residence district to use their property for business purposes. See Hadacheck v. Los Angeles, 239 U. S. 394, 36 S. Ct. 143, 60 L. Ed. 348, Ann. Cas. 1917B, 927; Cusack v. Chicago, 242 U. S. 529, 37 S. Ct. 190, 61 L. Ed. 472, L. R. A. 1918A, 136, Ann. Cas. 1917C, 594; St. Louis Poster Co. v. St. Louis, 249 U. S. 269, 39 S. Ct. 274, 63 L. Ed. 599. [Also Welch v. Swasey, 214 U. S. 91, 29 S. Ct. 567, 53 L. Ed. 923; herein all cited again by the Chief Justice.]

"And the court of last resort in each of the following states has recognized the authority of cities to enact so-called zoning ordinances, creating residence districts and commercial districts, and prohibiting business establishments in residence districts, viz.: In New York, * * *; Massachusetts, * * *; New Jersey, * * *; Iowa, * * *; Utah, * * *; Missouri, * * *; Kansas. * * *"

See, also, Harris v. Louisville, 165 Ky. 559, 177 S. W. 472, Ann. Cas. 1917B, 149; Hopkins v. Richmond, 117 Va. 692, 86 S. E. 139, Ann. Cas. 1917D, 1114.

The Chief Justice, who was also the organ of this court in the Civello Case, was doubtless too modest to quote therefrom; but I have found his statement of the law in that case so clear and succinct, that I felt constrained to reproduce it here.

And I agree with the Chief Justice, that

there is no difference in principle between an ordinance which restricts the use of property in residential districts to residential purposes, and an ordinance which restricts the use of property in white residential districts to white residential purposes, and in negro residential districts to negro residential purposes. Both put *some* restrictions on an owner's *use* of his property in the general public interest. But so also do *most* laws place some *restraints* on the conduct of individuals; whence comes civil liberty.

And if a man's so-called *natural liberty* may be restrained for the common good, there is no sound reason under the sun why his *natural right* to do as he pleases with his own, may not also be restrained in the interest of the general welfare.

A man is none the less free because restrained in his personal conduct by wholesome laws; nor is his property any less valuable because restricted to such use as will best promote the general welfare. If this be not true, then the bushmen of Australia enjoy the *blessings of freedom* to a greater degree than do the citizens of this great republic; and property in central Africa ought to be more valuable than in London or New York.

## III.

If the doctrine in *Buchanan v. Warley* conflicts with these views, and that doctrine be adhered to, then that case marks a long step backwards in the march of civilization; not so much because it interferes with the segregation of the races (which will take care of itself), but more especially because it will serve in future as a precedent against still *other* restrictions on the use of property, which, in time, may become necessary in the public interest; and it ought therefore to be *overruled* before the rolling pebble becomes an avalanche. At any rate, this court should add nothing to the growing mass.

I concur in both opinion and decree.