[Civ. No. 14146. Second Dist., Div. One. Oct. 6, 1944.]

FRANCES MAUDE STONE et al., Respondents, v. CLAR-
ENCE A. JONES et al., Appellants.

Willis O. Tyler and Loren Miller for Appellants.

Howard F. Shepherd for Respondents.

THE COURT.—This is an action to enforce a covenant and agreement entered into by certain lot owners, by the terms of which it was agreed that said lots should not be used or occupied by persons other than the Caucasian race. Defendants and appellants are Negroes who purchased and occupied one of said lots, so restricted against such occupancy.

The record reveals that said agreement and declaration of restrictions was executed in 1927; that the property in question lies within an area in the city of Los Angeles bounded on the south by Adams Boulevard, on the north by Washington Boulevard, on the west by Normandie Avenue and on the east by Vermont Avenue; that the above described district consisted of a number of different tracts and many of the owners of lots in the different tracts did not enter into the agreement and declaration herein considered; just what proportion did so does not appear; and, at the date of trial, that out of 781 lots within said area 16 or 18 were occupied by Negroes or persons not of the Caucasian race.

The lot belonging to appellants was located in said district in what is known as Cook & Miller's Resubdivision of Blocks A, B & C of the Adams Tract, consisting of 48 lots, 46 of which are improved with residence dwellings. The court found as a fact, ''That it is true that persons other than the defendants who are non-Caucasians, own and occupy property in the district between the streets above mentioned, but it is true that such occupancy is in isolated instances only, and it is true that the buildings and homes in the said district are substantially all occupied by persons of the white or Caucasian race,

and it is true that the use and occupancy of homes and properties in said district by persons of other than the Caucasian race is in such a small proportion as to be negligible, and it is not true that the district cannot be maintained as a district exclusively for occupancy by persons of the white or Caucasian race. That it is not true that the property adjacent to or surrounding the district included within the streets mentioned, or particularly in the vicinity of plaintiffs' properties, is occupied by many non-Caucasian persons, . . . '' The evidence shows that, of the lots in said Cook & Miller's Resubdivision, three lots were occupied by persons not of the Caucasian race, one so occupied for 28 years (beginning before the restriction was imposed), one being the lot occupied by appellants and the other by a non-Caucasian who moved in since the within action was commenced.

With regard to the purchase by appellants and occupancy of the lot in question the court found as fact, ''That it is true that prior to the time the above menioned Lot 15 in Block B was purchased and acquired by the defendants Clarence A. Jones and Edith A. Jones, said defendants had actual knowledge of the above mentioned declaration of restrictions and of all of its terms in that there was exhibited to them a true copy of said agreement, and had knowledge of the fact that the same so appeared of record as above found, and that the said declaration of restrictions purported to affect and restrict the use and occupancy of the above mentioned Lot 15 in Block B, in the several respects as above alleged, but that notwithstanding such notice and knowledge, the said Clarence A. Jones and Edith A. Jones purchased the said premises, moved into and are now occupying and using the said premises contrary to the provisions of the above mentioned declaration of restrictions, in that it is true that the said Jones are persons other than of the white or Caucasian race. That it is true that said defendants claim that the above mentioned declaration of restrictions is invalid and of no effect as to said lot, and that the plaintiffs claim said declaration of restrictions imposed upon said lot a valid restriction against its use or occupancy by persons other than of the Caucasian race.''

The answer, with few exceptions, denies specifically the allegations in plaintiffs' complaint and in addition sets up ten alleged separate and affirmative defenses, which in substance recite that the agreement in question undertook to restrict all of the property located within the area bounded by the four

streets above mentioned but that all of the property owners in said district failed to sign said agreement; that of 781 lots in said district only 115 lot owners signed the same; that certain signatures were not the signatures of lot owners; that certain owners refused to sign said declaration; that said declaration was not legally acknowledged; that said agreement was circulated with the promise that unless all lot owners signed the same it would not be recorded; that persons other than Caucasians owned and occupied property in said district; that said district cannot be maintained as a district "exclusively for white"; "that all places of public accommodation, such as stores and shops in said district and immediately adjacent thereto, are frequented and patronized by persons of color, as well as are the places of public accommodation, such as the railways, busses, parks, schools and libraries, and that the said district and its immediate vicinity on all sides is used by persons other than of the white race, and this in large numbers"; "that more than one hundred of the owners of lots in the area sought to be made into such an exclusive white residential district by the alleged agreement, have expressed their desire and willingness to sell their property to non-white persons, and that for reason of the occupancy in said area and district by non-white persons, and of the opportunity thus afforded non-white persons to buy property in said district, the said district cannot be maintained, either by a decree in equity, or otherwise, as an exclusive white district"; "that there are in all, thirty-one subdivisions, or tracts, contained in the said area, and that one-half of said tracts, or subdivisions, are freed by the alleged purported restrictive agreement"; "that the purported restrictions, covenants and agreements do not run with the land, and were not imposed in any deeds, or covenants, to said lands as a part of any general scheme or plan for the improvement of the same, or for the holding, occupying or conveyancing of the same"; "that the said area, or district, is located in what is now a city of 1,500,000 population; that the same is what is called an old part of the City of Los Angeles, and is not, nor has it ever been, an 'exclusive' residential district; that the character of the buildings on said lots is mediocre throughout the whole district, and that the same was not subdivided or laid out as a district exclusively for white persons, either by plan contained in the covenants, or by covenants, restrictions

or agreements''; ''that during the past fifteen years, the time that has elapsed since said declaration of restrictions was attempted, the houses occupied by persons non-Caucasian have increased in number and have spread, not only throughout the city, but particularly in the district adjacent to and surrounding the proposed restricted areas, and that it is inequitable at this time to attempt to enforce the alleged agreement of restrictions and thus prevent the occupancy of property of particular lots when the most of the property, both in this area and surrounding the same, is open to occupancy by persons non-Caucasian''; that the enforcement of such restrictions would be an unlawful discrimination against defendants as a class in violation of the Constitution of the United States.

The court found against defendants on all material and pertinent issues.

Appellants' opening brief recites that, ''Appellants, as defendants, asserted the invalidity of the restriction upon the grounds that its purpose and intention was to constitute, or at least maintain a 'white' neighborhood, but that since the great majority of the lots in the district are unrestricted, and since many Negro families were lawfully occupying property in the 'district,' the purpose of the agreement failed in its inception, and further failed by reason of the fact that the owners of the lots in the district did not sign it, other than to the extent heretofore mentioned, and that there remains no grounds upon which the court could base an injunction.''

■ At the outset, it should be noted that agreements containing restrictions as to the use of property include a great variety of subjects. Such contracts relating to dwellings and the cost and type thereof, a variety of business purposes, manufacturing, the sale of intoxicating beverages, and amusement purposes, are just a few of the many that the law has consistently recognized as valid. And necessarily so, for the Constitution guarantees the right to contract freely for lawful purposes. Equitable principles apply to all of such contracts alike, regardless of the subject of the contract. The equities of the parties alone are involved; the judgment affects them only, hence, any effort to include in the controversy the indirect consequences as to others contemplates a false issue.

Such contracts relating to race restrictions have been upheld uniformly. See *Burkhardt* v. *Lofton*, 63 Cal.App.2d 230

[146 P.2d 720]. In the recent case of *Fairchild* v. *Raines,* 24 Cal.2d 818 [151 P.2d 260], the Supreme Court declared as follows (at p. 827), "It is, of course, true that race restriction agreements as to the use and occupancy of real property are normally recognized as valid (*Los Angeles Investment Co.* v. *Gary* (1919), 181 Cal. 680, 683-684 [186 P. 596, 9 A.L.R. 115]) and enforcible by injunction (*Wayt* v. *Patee* (1928), 205 Cal. 46, 49-50 [269 P. 660]). It is also true that where all, or perhaps substantially all, of the contiguous lots of a tract of substantial extent are subject to race restrictions the courts should not fail to enforce the covenants as to the restricted area merely because surrounding property eventually is put to the use and occupation prohibited to the restricted area. (See *Porter* v. *Johnson* (1938), 232 Mo.App. 1150, 1158 [115 S.W.2d 529].) Obviously the precise purpose of the covenants is to avert changes in the restricted territory, not in the surrounding neighborhood, and they can have no legal efficacy beyond the area of the tract to which they are applicable. The mere fact that a change in the character of the use of neighboring property may make free use of restricted property more profitable does not warrant failure to enforce the restriction 'if the original purpose of the covenant can still be realized.' (*Marra* v. *Aetna Construction Co.* (1940), *supra,* 15 Cal.2d 375, 378 [101 P.2d 490], a building restriction case.)" In the same case, the court also points out that "subject to certain broad principles, each case of this character must be determined upon the facts peculiar to it." And this is so because of the very nature of the issues involved and because of the variety of situations incident to such agreements, for in such circumstances there can be no formula by which the equities in one case can be measured by the equities in another.

Actions of the character of the one here considered involve issues that are the direct product of a contractual relation. The parties to the action necessarily must be either those who executed the agreement or their successors in interest. The valid and actual contractual obligations are binding and enforcible unless for purely equitable reasons the enforcement thereof would be to no purpose so far as the rights of the parties to the action are concerned. Collateral possibilities or indirect consequences are beside the issue. Changes, or the likelihood thereof, incident to the growth of a community, may create or forecast perplexing social problems,

but such problems, from the very nature of things, cannot be solved by the courts in the process of litigation of a purely private nature. Any attempt to do so would be an unwarranted interference with the functions of other branches of the government already equipped with power and means for the comprehensive consideration of such problems.

Appellants' contention, therefore, that the purpose of the agreement in question failed in its inception cannot be upheld. And, any contention that the agreement was only intended to take effect after a certain number of signatures had been obtained is refuted by the findings of the court, supported by the evidence. The findings, upon the evidence, also refute the contention that the purpose of the agreement failed in its inception because of the nature of the neighborhood. It should be noted in this connection that, like any other contract, such an agreement, so long as its subject is lawful, does not depend for its validity upon the existence or necessity of any particular purpose. Thus, a general purpose may be expressed, but a failure to express a general purpose does not necessarily affect its validity. A contract may fail in its inception for uncertainty or because its subject is unlawful, but not because it lacks a preamble. If intelligible, its purpose is revealed by its terms. And in any event, whatever its purpose may be, any contract can control only the parties thereto or their successors in interest.

With regard to appellants' contention that the agreement was not "acknowledged so as to be recorded," the court's finding to the contrary is supported by the record.

As heretofore noted, it is argued that the contract is invalid and unenforcible because some of the owners of lots in the district above described failed to sign it. The argument is without merit; the number of parties to such an agreement is not the test of its validity.

It is also argued that "There are only four theories upon which the judgment and decree can possibly rest." The record reveals the judgment and decree to be based on the evidence—not upon *theories*. And the trial was upon the issues presented by the pleadings.

The separate and affirmative defense, that relies on the constitutional provisions, is submitted without citation of authority. The same proposition was presented in *Burkhardt v. Lofton, supra,* and there held untenable; the decision is supported by abundant authority.

■ As pointed out in *Fairchild* v. *Raines*, "It is the general rule that the granting or withholding of equitable relief involves the exercise of judicial discretion." In the within action, nothing has been presented that suggests an abuse of that discretion by the trial court. The findings are supported by the evidence and there are no prejudicial errors in the record, for which reason the judgment must be affirmed, and it is so ordered. The attempted appeal from the order denying the motion for a new trial is dismissed.

A petition for a rehearing was denied October 30, 1944, and appellants' petition for a hearing by the Supreme Court was denied December 4, 1944. Traynor, J., voted for a hearing.