**HURD et al. v. HODGE et al.**
**URCIOLO et al. v. SAME.**

**Nos. 9196, 9197.**

United States Court of Appeals
District of Columbia.

Argued Nov. 21, 1946.
Decided May 26, 1947.

EDGERTON, J., dissenting.

---

Raphael G. Urciolo, pro se, in No. 9197.

Mr. Charles H. Houston, of Washington, D. C., for appellants in both cases, except appellant Urciolo in No. 9197.

Mr. Henry Gilligan, of Washington, D. C., for appellees. Mr. Thomas X. Dunn, of Washington, D. C., also entered an appearance for appellees.

Before EDGERTON, CLARK and WILBUR K. MILLER, Associate Justices.

CLARK, Associate Justice.

By these appeals we are once again called upon to determine the validity of a restrictive deed covenant expressed in the following terms: "Subject also to the covenants that said lot shall never be rented, leased, sold, transferred or conveyed unto any Negro or colored person, under a penalty of Two Thousand Dollars ($2000), which shall be a lien against said property."

The area involved in these actions is the first 20 lots of the 100 Block of Bryant Street, Northwest, improved by dwellings known as 114 to 152 Bryant Street, Northwest. All of these lots and dwellings were sold subject to the above restrictive deed covenant. The adjoining 11 lots improved by dwellings known at 154 to 174 Bryant Street, Northwest, are not subject to any such restriction and have been continuously occupied by Negroes for 20 years. The occupancy by white persons of the 20 lots and dwellings subject to the restriction has been continuous[1] until the four deeds[2] complained of in these actions.

The final judgment of the District Court from which these appeals were taken de-

---

[1] Except for three transactions where the Negroes involved either did not occupy or moved on protest without the necessity of legal proceedings.

[2] Deed dated May 4, 1944, and recorded May 9, 1944, as Instrument No. 12561 among the Land Records of the District of Columbia, from Francis X. Ryan and Mary R. Ryan, his wife, to James M. Hurd and Mary I. Hurd, his wife, concerning Lot 114, Square 3125, improved by premises 116 Bryant Street, Northwest; deed dated March 10, 1945, and recorded March 21, 1945 as Instrument No. 9208 among the Land Records of the District of Columbia, from Raphael G. Urciolo and Florence E. Urciolo, his wife, to Robert H. Rowe and Isabelle J. Rowe, his wife, concerning Lot 113, Square 3125, improved by premises 118 Bryant Street, Northwest; deed dated March 13, 1945, and recorded March 30, 1945 as Instrument No. 10582 among the Land Records of the District of Columbia, from Florence E. Urciolo to Herbert E. Savage and Georgia N. Savage, his wife, concerning Lot 144, Square 3125, improved by premises 134 Bryant Street, Northwest; and deed dated March 9, 1945, and recorded March 21, 1945 as Instrument No. 9210 among the Land Records of the District of Columbia, from Florence E. Urciolo to Pauline B. Stewart concerning Lot 136, Square 3125, improved by premises 150 Bryant Street, Northwest.

clared null and void these four deeds to the Negro purchasers, ordered them to vacate the land and premises and permanently enjoined the renting, selling, leasing, transferring or conveying the said lots to any Negro or colored person.

The validity of the restrictive deed covenant before us now has been upheld by this Court on numerous occasions. Torrey v. Wolfes, 56 App.D.C. 4, 6 F.2d 702; Cornish v. O'Donoghue, 58 App.D.C. 359, 30 F.2d 983, certiorari denied, 279 U.S. 871, 49 S. Ct. 512, 73 L.Ed. 1007; Grady v. Garland, 67 App.D.C. 73, 89 F.2d 817, certiorari denied, 302 U.S. 694, 58 S.Ct. 13, 82 L.Ed. 536; Hundley v. Gorewitz, 77 U.S.App.D.C. 48, 132 F.2d 23, 24, wherein we said: "In view of the consistent adjudications in similar cases, it must now be conceded that the settled law in this jurisdiction is that such covenants as this are valid and enforceable in equity by way of injunction."

Similarly, restrictive covenants expressed in agreements between the owners of land have been upheld by this Court in the following cases: Corrigan v. Buckley, 55 App.D.C. 30, 299 F. 899, appeal dismissed 271 U.S. 323, 46 S.Ct. 521, 70 L.Ed. 969; Russell v. Wallace, 58 App.D.C. 357, 30 F.2d 981, certiorari denied, 279 U.S. 871, 49 S.Ct. 512, 73 L.Ed. 1007; Mays v. Burgess, 79 U.S.App.D.C. 343, 147 F.2d 869, 871, 162 A.L.R. 168, certiorari denied, 325 U.S. 868, 65 S.Ct. 1406, 89 L.Ed. 1987, rehearing denied 325 U.S. 896, 65 S.Ct. 1567, 89 L.Ed. 2006.

The appellants here have presented no contention that is not answered by those decisions. Thus, what we said in Mays v. Burgess when it was before us for the first time is applicable here; "Unless, therefore, we are prepared to reverse and annul all that we have said on this subject, and to destroy contracts and titles to valuable real estate made and taken on the faith of our decisions, it follows that the only question now open for discussion is whether, under the rule announced in Hundley v. Gorewitz, supra, the purpose of the restrictive condition has failed by reason of a change in the character of the neighborhood, so that its enforcement would impose a hardship rather than a benefit upon those who were parties to its terms." We went on, in that case, to hold that "no such change or transformation in the character of the property has occurred." Mays v. Burgess involved the same area as that concerned in the instant cases and is controlling here, especially in view of what we said when that case was before us for a second time, 80 U.S.App.D.C. 236, 152 F.2d 123, 124: "When this case was here before it was argued at great length that the character of the neighborhood had changed since the making and recording of the covenants, and the points of hardship and lack of reasonable housing accommodations in the District of Columbia, now reiterated, were stressed and urged. We considered both points and held that they were not sufficient to justify the abrogation of the rule of law which this court had applied consistently in similar cases over a period of twenty-five years. The fact that since the case was originally heard below, a similar covenant, covering property in an adjoining block, has expired by time limitation and four purchases by colored people have been made, would not, even if it had occurred before decision, have changed the result. As we said in our former opinion, the neighborhood, consisting of approximately one thousand homes, churches and business properties, was exclusively occupied by persons of the white race, under similar restrictive agreements or deed covenants. The infiltration of four colored families would not have required our applying the rule we did in Hundley v. Gorewitz, 77 U.S.App.D.C. 48, 132 F.2d 23, where we held the restrictive condition had failed by reason of the change in the neighborhood, so that its enforcement would impose a hardship rather than an advantage to those who complied with its terms."

It is to be further noted that while the "change in neighborhood" argument was presented to us in appellants' brief, this contention was expressly repudiated by appellant Urciolo at oral argument.

In re-affirming our holding that the restrictive deed covenant here involved is valid and enforceable by injunction we have again thoroughly considered the contention that such a restriction constitutes an illegal restraint on alienation. We adhere to what we said on this point in Mays v. Bur-

gess, 79 U.S.App.D.C. 343, at page 345, 147 F.2d 869, 162 A.L.R. 168. Although that case involved a restriction which was to be in effect for a designated length of time, 21 years only, and the instant covenant involves a perpetual restriction, we adopt what we said there as applying here. We note that there is a decided division in authority as to the validity and enforceability of such a perpetual restriction.[3] We further note that in some jurisdictions the validity of the restrictive covenant or agreement turns on a distinction in terminology between restrictions as to ownership and restrictions as to use and occupation.[4] Such restrictions as to use and occupancy are generally held valid and enforceable in equity, even in those jurisdictions holding restrictions on ownership invalid as restraints on alienation.[5]

However, in this jurisdiction the validity and enforceability of the covenant or agreement does not turn on such a distinction and we have no conflict in our decisions, which have, for over 25 years, uniformly upheld the validity of these restrictive conditions, whether by deed covenant or agreement between property owners, whether for a designated length of time or perpetual, and whether against alienation, use and occupancy or both.[6] We observe that in other jurisdictions the majority of recent decisions are in accord with our holding.[7] See also The American Law Institute's Restatement of The Law of Property, dealing with Perpetuities and other Social Restrictions, Sec. 406, Comments 1 and o.

Affirmed.

EDGERTON, Associate Justice (dissenting).

The court holds that perpetual deed covenants forbidding sale of homes to Negroes are valid and enforceable by injunctions cancelling sales, evicting Negroes from homes that they have bought, and preventing sales to other Negroes. I think this erroneous for five reasons, each independent of the other four. The covenants are void as unreasonable restraints on alienation. They are void because contrary to public policy. Their enforcement by injunction is inequitable. Their enforcement by injunction violates the due process clause of the Fifth Amendment. Their enforcement by injunction violates the Civil Rights Act which requires that "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." R.S. § 1978, 8 U.S.C. A. § 42.

Despite the great importance of the questions whether racial restrictive covenants are valid and whether they are enforceable by injunction, the Supreme Court has never ruled on either.[1] The opposite is often assumed. In this court's recent case of Mays v. Burgess[2] both the principal opinion and the concurring opinion appear to reflect a belief that the issues then and now before this court have been decided by the Supreme Court. The court now relies on that case among others.

The erroneous impression that the Supreme Court has ruled on these questions

---

[3] 162 A.L.R. 180, supplementing annotations in 114 A.L.R. 1237, 66 A.L.R. 531 and 9 A.L.R. 120; 5 Tiffany Real Property, 3d Ed., Sec. 1345.

[4] Mays v. Burgess, 79 U.S.App.D.C. 343, 147 F.2d 869, 162 A.L.R. 180.

[5] Burkhardt v. Lofton, 63 Cal.App.2d 230, 146 P.2d 720; Fairchild v. Raines, 24 Cal.2d 818, 151 P.2d 260; Stone v. Jones, 66 Cal.App.2d 264, 152 P.2d 19.

[6] See cases cited from this jurisdiction, supra.

[7] Dooley v. Savannah Bank & Trust Co., 199 Ga. 353, 34 S.E.2d 522 (perpetual); Lion's Head Lake v. Brzezinski, 43 A.2d 729, 23 N.J.Misc. 290 (perpetual); Lyons v. Wallen, 191 Okl. 567, 133 P.2d 555 (99 years); Steward v. Cronan, 105 Colo. 393, 98 P.2d 999 (designated length of time); Thornhill v. Herdt, Mo.App., 130 S.W.2d 175 (20 years); Vernon v. R. J. Reynolds Realty Co., 226 N.C. 58, 36 S.E.2d 710 (50 years).

[1] The few state courts that have passed on the questions are divided. Cases are collected in McGovney, Racial Residential Segregation by State Court Enforcement of Restrictive Agreements, Covenants or Conditions in Deeds is Unconstitutional, 33 Calif.L.Rev. 5, 10 (1945).

[2] 79 U.S.App.D.C. 343, 147 F.2d 869, 162 A.L.R. 168, certiorari denied, two Justices dissenting, 325 U.S. 868, 65 S.Ct. 1406, 89 L.Ed. 1987, rehearing denied, 325 U.S. 896, 65 S.Ct. 1567, 89 L.Ed. 2006.

**236**

results from misinterpretation of Corrigan v. Buckley, 1926, 271 U.S. 323, 46 S.Ct. 521, 70 L.Ed. 969. In that case a bill was filed in the trial court of the District of Columbia to enforce a racial restrictive covenant by injunction. The defendants moved to dismiss the bill on the sole ground that the "covenant is void" because in conflict with the Constitution and the laws of the United States and with public policy. The trial court overruled the motions and granted the injunction, and this court affirmed.[3] This court ruled only that the covenant was not unconstitutional or contrary to public policy or void. The pleadings presented no other issue.

Corrigan v. Buckley reached the Supreme Court on *appeal* and not on certiorari. Section 250 of the Judicial Code as it read on the critical date authorized appeals in six sorts of cases, including (Third) "cases involving the construction or application of the Constitution of the United States * * *" and (Sixth) "cases in which the construction of any law of the United States is drawn in question by the defendant."[4] The defendants based their appeal solely on the contention that the covenant was "void" because it violated the Fifth, Thirteenth and Fourteenth Amendments of the Constitution and also the Civil Rights Act, §§ 1977, 1978 and 1979 of the Revised Statutes, 8 U.S.C.A. §§ 41–43. The Supreme Court held that since the Fifth and Fourteenth Amendments dealt only with government action and not with action of private persons, and the Thirteenth only with involuntary servitude, the contention that these amendments made the *covenant void* raised no substantial question.[5] One of the sections of the Civil Rights Act on which the appellants relied, R.S. § 1978, provides that all citizens shall have the same right as white citizens to purchase

and hold property. The Court decided that the several sections, "like the Constitutional Amendment under whose sanction they were enacted, do not in any manner prohibit or invalidate contracts entered into by private individuals in respect to the control and disposition of their own property. There is no color for the contention that they rendered the indenture void * * *. We therefore conclude that neither the constitutional nor statutory questions relied on as grounds for the appeal to this Court have any substantial quality or color of merit, or afford any jurisdictional basis for the appeal."[6] For want of jurisdiction, therefore, and without at all implying that the appealed judgment was right, the Court dismissed the appeal. Since it had no jurisdiction it could decide no question that was not involved in reaching that conclusion. Accordingly it decided nothing with regard to racial restrictive covenants except that *the Constitution and the Civil Rights Act* plainly do not make them *void.*[7]

No contention that either the Constitution or the Civil Rights Act prohibited *enforcement by injunction* of such covenants was raised by any pleading in any court, or was considered by the District Court, or was considered by this court. Despite that fact, by brief and argument the appellants undertook to raise in the Supreme Court the contention that *"the decrees* of the courts below constitute a violation of the Fifth and Fourteenth Amendments to the Constitution, in that they deprive the appellants of their liberty and property without due process of law."[8] The Court pointed out that since this contention was not raised by the pleadings it could not give the Court jurisdiction of the appeal, and then added, without a word of argument, six words of dictum adverse to the contention itself: "it likewise is lacking in substance."[9]

---

3 1924, 55 App.D.C. 30, 299 F. 899.

4 36 Stat. 1159.

5 "It is obvious that none of these Amendments prohibited private individuals from entering into contracts respecting the control and disposition of their own property; and there is no color whatever for the contention that they rendered the indenture void." 271 U.S. 323, 330, 46 S.Ct. 521, 523, 70 L.Ed. 969.

6 271 U.S. 323, 331, 46 S.Ct. 521, 524, 70 L.Ed. 969.

7 In my dissent in the Mays case, 79 U.S.App.D.C. 343, 349, par. (4), 147 F.2d 869, 162 A.L.R. 168, I mistakenly attributed greater breadth to the Corrigan decision.

8 271 U.S. 323, 324, 46 S.Ct. 521, 70 L. Ed. 969; italics supplied.

9 "And, while it was further urged in this Court that the decrees of the courts

The difference between the only point decided by the Supreme Court—that the Constitution and the Civil Rights Act plainly do not make a racial restrictive covenant void—and our own court's proposition that such a covenant is both valid and enforceable by injunction, is very great. Since the Supreme Court had no jurisdiction it could not decide even whether the covenant is void or valid, but necessarily left open the questions (1) whether it is "void because contrary to public policy"[10] and (2) whether it is void as an unreasonable restraint on alienation. Regardless of whether damages can or cannot be recovered for its breach, its specific enforcement by injunction, which much more directly and effectively prevents Negroes from buying and using the property, may be forbidden either (3) by the Constitution, (4) by the Civil Rights Act, or (5) by principles of equity. The Supreme Court did not and could not decide any of these questions in Corrigan v. Buckley. Its dictum touched only the third of these questions.

Aside from that dictum and the narrow point on which the Supreme Court actually ruled, this court's present decision that racial restrictive covenants are valid and enforceable by injunction rests only on our own past decisions to like effect. In my opinion those decisions, which were reached without full consideration of the questions involved, are erroneous and should be overruled. I think all five of the questions enumerated in the preceding paragraph must be answered in appellants' favor. If any one of them is so answered the appealed judgments must be reversed.[11]

The fifth question requires little discussion. It is enough to point out that the familiar principle of "balancing equities" precludes any injunction in this case because, in view of the present housing situation, the extreme hardship which injunctions will inflict upon the appellants greatly outweighs any benefits which the appellees may possibly derive from them; and that "especially courts of equity, may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest."[12] I discuss the other four questions in the following order: I, the Constitution; II, the Civil Rights Act; III, restraint on alienation; IV, public policy.

*I. The Constitution.* In Buchanan v. Warley, 1917, 245 U.S. 60, 38 S.Ct. 16, 62 L. Ed. 149, L.R.A.1918C, 210, Ann.Cas.1918A,.

below in themselves deprived the defendants of their liberty and property without due process of law, in violation of the Fifth and Fourteenth Amendments, this contention likewise cannot serve as a jurisdictional basis for the appeal. Assuming that such a contention, if of a substantial character, might have constituted ground for an appeal under paragraph 3 of the Code provision, it was not raised by the petition for the appeal or by any assignment of error, either in the Court of Appeals or in this Court; and it likewise is lacking in substance." 271 U.S. 323, 331, 46 S.Ct. 521, 524, 70 L.Ed. 969.

[10] The Court pointed out that since it had no jurisdiction of the appeal it could not rule upon the contention that the covenant "is not only void because contrary to public policy, but is also of such a discriminatory character that a court of equity will not lend its aid by enforcing the specific performance of the covenant." 271 U.S. at page 332, 46 S.Ct. at page 524.

[11] In addition to these five general grounds for reversal there are at least two special grounds. (1) The covenants were intended to increase the value of the restricted property and to maintain a white neighborhood. The record shows that Negroes will pay much more than whites for the property and that the neighborhood is no longer white. Enforcement of the covenants defeats their economic purpose and does not accomplish their other purpose. The rule of Hundley v. Gorewitz, 77 U.S.App.D.C. 48, 132 F.2d 23, therefore applies. (2) The injunctions are broader than the covenants. The covenants are that the lots "shall never be rented, leased, sold, transferred or conveyed unto any Negro or colored person * * *" There is no covenant against use or occupation. The injunctions not only set aside transfers but also order the colored appellants to "remove themselves and all of their personal belongings from the land." A covenant against rental, lease, sale, etc., is an entirely different thing from a covenant against use and occupation. This court has recently approved practically the same distinction which it now ignores. Gospel Spreading Ass'n v. Bennetts, 79 U.S.App. D.C. 352, 147 F.2d 878.

[12] Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 492, 62 S.Ct. 402, 405, 86 L.Ed. 363.

1201, the Supreme Court held that enforcement of a Louisville ordinance which forbade Negroes to move into predominantly white city blocks and whites to move into predominantly Negro city blocks would violate the Constitution and also, apparently, the Civil Rights Act.[13] The Court said: "The concrete question here is: May the occupancy, and, necessarily, the purchase and sale of property of which occupancy is an incident, be inhibited by the States, or by one of its municipalities, solely because of the color of the proposed occupant of the premises?" 245 U.S. at page 75, 38 S.Ct. at page 18. "Colored persons are citizens of the United States and have the right to purchase property and enjoy and use the same without laws discriminating against them solely on account of color. * * * These enactments did not deal with the social rights of men, but with those fundamental rights in property which it was intended to secure upon the same terms to citizens of every race and color. * * * The Fourteenth Amendment and these statutes enacted in furtherance of its purpose operate to qualify and entitle a colored man to acquire property without state legislation discriminating against him solely because of color." 245 U.S. at pages 78, 79, 38 S.Ct. at page 19. "We think this attempt to prevent the alienation of the property in question to a person of color was not a legitimate exercise of the police power of the State, and is in direct violation of the fundamental law enacted in the Fourteenth Amendment of the Constitution preventing state interference with property rights except by due process of law." 245 U.S. at page 82, 38 S.Ct. at page 20. The Court held that the ordinance invaded even the rights of a white vendor, who could therefore avoid it and enforce performance of a colored purchaser's contract.

But "so far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose."[14] Specifically, ordinances that limit what may be done with property in a given area are constitutional and enforceable unless they "are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."[15] So, as the Court held in the Euclid case, a city may exclude businesses and even apartment houses from a residence area merely because the city thinks it best to segregate them elsewhere. In the light of the Euclid case, therefore, Buchanan v. Warley determines among other things that it is clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare, to prevent property in a white neighborhood from being transferred to and used by Negroes.

The upshot is that Negroes have a constitutional right to buy and use, and whites to sell to Negroes, whatever real property they can without direct government interference based on race.

Such interference is forbidden even when it accords with the wishes of the inhabitants of a neighborhood as well as the act of a legislature. A New Orleans ordinance forbade Negroes to establish residence in a white community and whites to establish residence in a Negro community (as defined), "except on the written consent of a majority of the persons of the opposite race inhabiting such community." On the authority of the Buchanan case the Supreme Court held this ordinance void.[16] If an ordinance forbade Negroes

---

[13] R.S. §§ 1977, 1978. § 1978, which assures to all citizens the same right as white citizens to purchase and hold property, is discussed in part II of this opinion.

[14] Nebbia v. People of State of New York, 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A.L.R. 1469. Reitz v. Mealey, 314 U.S. 33, 36, 62 S.Ct. 24, 86 L.Ed. 21; Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 169, 64 S.Ct. 438, 88 L.Ed. 645.

[15] Euclid v. Ambler Realty Co., 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303, 54 A.L.R. 1016. Nectow v. City of Cambridge, 277 U.S. 183, 187, 48 S.Ct. 447, 72 L.Ed. 842.

[16] Harmon v. Tyler, 273 U.S. 668, 47 S.Ct. 471, 71 L.Ed. 831, reversing Tyler v. Harmon, 160 La. 943, 107 So. 704. Cf. Tyler v. Harmon, 158 La. 439, 104 So. 200.

to buy a house in a white community against the written dissent of a former owner of the house and a present owner of a neighboring house, obviously the ordinance and any injunction based upon it would be unconstitutional. The present question is whether an injunction which does the same thing without the support of an ordinance is constitutional.

The specific rule, adjudged by the Supreme Court in the Buchanan and Harmon cases, that it is arbitrary to exclude a race from a neighborhood is an instance of the general rule that "discriminations based on race alone are obviously irrelevant and invidious."[17] It has been contended that enforcement of covenants which exclude a race from a neighborhood does not involve discrimination because it permits reciprocity. This amounts to saying that if Negroes are excluded from decent housing they may retaliate by excluding whites from slums. Such reciprocity is not merely imaginary and unequal but irrelevant. Because appellants[18] are Negroes the court deprives them of homes which they could keep if they were white. Discrimination against them because of color is not merely relative but absolute. The imagined possibility that others may suffer similiar discrimination because they are white is as irrelevant as the certainty that others will suffer it because they are Negroes. Both the Louisville ordinance and the New Orleans ordinance which excluded Negroes from white neighborhoods also excluded whites from Negro neighborhoods. Since they undertook to discriminate because of race against members of both races they had a formal reciprocity that restrictive covenants lack. This did not reconcile their enforcement with the requirements of due process.

Restrictive covenants are not self-executing. This case arises because persons whom they purport to bind have violated them. The white appellants have sold restricted property to the colored appellants. The appellees, neighbors not directly involved in the sales, seek to set them aside. For that purpose they necessarily invoke the aid of a court of equity. If all persons whom the covenants purport to bind had refused to sell to Negroes, no government action would be involved but only the action of private individuals, and no question of due process of law would arise. The situation then would be comparable to the refusal of the innkeeper in the Civil Rights Cases[19] to serve Negroes. Even if some landowners had persuaded or hired others not to sell to Negroes, or Negroes not to buy, there would still be only private action, whether legal or illegal, and no due process question. But in this case private means have failed to produce compliance with the covenant and a court has been asked to enforce it. If the colored appellants refuse to vacate the premises in obedience to the court's decree it will be enforced against them through the court's power to punish for contempt; they may be imprisoned or fined, and dispossessed by force if necessary. The action that begins with the decree and ends with its enforcement is obviously direct government action. As this court said in Corrigan v. Buckley [299 F. 901], no Negro has "the constitutional power to compel sale and conveyance to him of any particular private property." But no such question was before the court then or is before it now. Appellants claim no constitutional power to compel sale and conveyance of any property. The question is whether a court of the United States has the constitutional power to cancel deeds which willing sellers have made to willing buyers, and evict the buyers from the property, because the buyers are Negroes.

Since courts are arms of government they are subject, like legislatures and executive officers, to the restrictions that the Constitution imposes on government. Every

---

[17] Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192, 203, 65 S.Ct. 226, 232, 89 L.Ed. 173.

[18] Though white grantors as well as colored grantees have appealed, throughout this opinion the unqualified word appellants refers only to the colored appellants.

[19] 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835.

In those cases the Court expressly distinguished "action of State officers executive or judicial" 109 U.S. at page 11, 3 S.Ct. at page 21; also action of individuals supported by "State authority in the shape of laws, customs, or judicial or executive proceedings" 109 U.S. at page 17, 3 S.Ct. at page 25.

case that holds legislation unconstitutional holds in terms or in effect that its judicial enforcement would be unconstitutional. The Constitution does not exempt any kind of judicial action from the requirements of due process of law. Not only legislation and procedure but judicially adopted rules of substantive law, including equity, are invalid when they conflict with these requirements.[20] Rules which the due process clause forbids legislatures to enact it forbids courts to adopt, for substantive due process is not a matter of method. A judicial decree which would be invalid if it had legislative sanction is not validated by lack of legislative sanction. Since racial restrictions on transfer and use of property are "clearly arbitrary and unreasonable" and do not promote the general welfare, the Constitution forbids courts to enforce such restrictions even when a legislature, for supposed public purposes, has attempted to impose them. Such restrictions are not less arbitrary and unreasonable, and not more conducive to the general welfare, when private persons acting without legislative sanction have attempted to impose them for private purposes. It follows that the Constitution forbids courts to enforce such restrictions in the second case, which is this case, as clearly as in the first, which is Buchanan v. Warley. It is strangely inconsistent to hold as this court does that although no legislature can authorize a court, even for a moment, to prevent Negroes from acquiring and using particular property, a mere owner of property at a given moment can authorize a court to do so for all time. Either the due process clauses of the Constitution do not forbid governments to prevent Negroes from acquiring and using particular property, in which case they do not forbid courts to enforce racial restrictions which statutes have imposed; or these clauses do forbid governments to prevent Negroes from acquiring and using particular property, in which case they forbid courts to enforce racial restrictions which covenants have imposed. Buchanan v. Warley rules out the first alternative.

As Judge Ross, the donor of the American Bar Association's Ross Essay Prize, said long ago in refusing to enforce by injunction a covenant against transfers to Chinese: "It would be a very narrow construction of the constitutional amendment in question and of the decisions based upon it * * * to hold that, while state and municipal legislatures are forbidden to discriminate against the Chinese in their legislation, a citizen of the state may lawfully do so by contract, which the courts may enforce. * * * The courts should no more enforce the one than the other."[21]

All this is said with due deference to the rule of the Corrigan case that the Constitution does not make racial covenants void.[22]

II. *The Civil Rights Act.* White citizens have, beyond question, the right to purchase the property in suit from willing sellers and to hold it. This court forbids colored citizens to do so. It thereby rules that they have no right to do so. The court does not say, and it would be a contradiction in terms to say, "Despite the fact that we forbid colored citizens to purchase and hold this property they have a right to do so." I see no possible escape from the fact that the

[20] Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676; Brinkerhoff-Faris Trust & Savings Co. v. Hill, 281 U.S. 673, 678–680, 50 S.Ct. 451, 74 L.Ed. 1107; Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; Cantwell v. State of Connecticut, 310 U.S. 296, 307–311, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352; A. F. of L. v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855; Bridges v. State of California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346; Bakery and Pastry Drivers and Helpers Local 802 of International Brotherhood of Teamsters v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178; Pennekamp v. State of Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295. Cf. McGovney, op. cit. supra note 1.

[21] Gandolfo v. Hartman, C.C.S.D.Cal. 1892, 49 F. 181, 182, 16 L.R.A. 277, 278.

[22] To say that the Constitution forbids direct and actual *enforcement* of a racial covenant by injunction—the only remedy which is intended to and necessarily does prevent Negroes from acquiring and using the restricted property—is not to say that it forbids awarding to a neighboring property owner such damages, if any, as an executed sale to a Negro may be shown to have caused.

court's ruling violates not only the due process clause of the Fifth Amendment but also the Civil Rights Act, which expressly provides that "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." [23] A statute which declares or confers a right means, if it means anything, that courts shall recognize and protect the right. Since (1) appellants are citizens of the United States, (2) the Act assures all citizens the same right as white citizens to purchase and hold property, and (3) white citizens have the right to purchase and hold the property in suit, the Act requires the courts to recognize and protect the very right which this court denies and destroys.

Nothing is alleged or found against appellants except their color. Since the injunctions are based on covenants alone and the covenants are based on color alone, ultimately the injunctions are based on color alone. Even if they were based on color in combination with other factors they would still violate the Act. The Act prohibits injunctions which depend in any degree upon the fact that the persons enjoined are colored, for any restriction which is imposed upon the right of colored citizens to purchase and hold property and would not be imposed upon the right of white citizens to purchase and hold the same property denies to colored citizens "the same right * * * as is enjoyed by white citizens."

It makes no difference that the court denies the right of Negroes to purchase and hold certain property only and not all the property in the District of Columbia. Much of the land in the District is covered by covenants like those in suit. Though these injunctions refer only to appellants' land, denying the right of appellants and other Negroes to buy this land has the practical effect of denying the right of any Negro to buy any land covered by any such covenant. Moreover, the conflict between the Act and the injunctions does not depend upon the fact that the injunctions have a general effect. If a municipal legislature were to pass an ordinance forbidding Negroes to purchase and hold precisely the land in suit, and no other, obviously the court could not prevent them from purchasing and holding it, since such prevention would violate the Act of Congress. I think it quite as plain that the court violates the Act of Congress when, without even the excuse of municipal legislation, it prevents Negroes from purchasing and holding this property. The expressed will of a former property-owner cannot authorize the court to deny a right which the expressed will of a legislature could not authorize it to deny.

Any opinion as to the reasonableness or desirability of preventing Negroes from purchasing and holding this property is irrelevant to the present point. The Constitution and the Civil Rights Act have foreclosed the matter. The right to buy and use anything that whites may buy and use is conferred upon Negroes implicitly by the due process clauses of the Fifth and Fourteenth Amendments and explicitly by the Civil Rights Act. Of the civil rights so conferred, none is clearer and few are more vital than the right to buy a home and live in it.

The Corrigan case holds that the Civil Rights Act does not make racial covenants *void*, but the Supreme Court has never held that the Act does not forbid direct governmental denial and destruction of the right of Negroes to acquire property. The Buchanan case holds the contrary.

*III. Restraint on Alienation.* "The underlying principle which operates throughout the field of property law is that freedom to alienate property interests which one

---

[23] R.S. § 1978, 8 U.S.C.A. § 42. The words are taken without material change from the Civil Rights Act of April 9, 1866, 14 Stat. 27, § 1.

Obviously the District of Columbia is within the meaning of the term "every State and Territory" as used in this statute. Cf. Talbott v. Silver Bow County, 139 U.S. 438, 444, 11 S.Ct. 594, 35 L.Ed. 210; Geofroy v. Riggs, 133 U.S. 258, 10 S.Ct. 295, 33 L.Ed. 642. And since Congress has the power of a state legislature in the District of Columbia the statute is plainly valid there.

may own is essential to the welfare of society. [This assumption rests] in part upon the necessity of maintaining a society controlled primarily by its living members, in part upon the social desirability of facilitating the utilization of wealth, and in part upon the social desirability of keeping property responsive to the current exigencies of its current beneficial owners. Restraints on alienation are from their very nature inconsistent with the policy of freedom of alienation. Thus, to uphold them, justification must be found in the objective that is thereby sought to be accomplished or on the ground that the interference with alienation in the particular case is so negligible that the major policies furthered by freedom of alienation are not materially hampered."[24] Elaborating this analysis the American Law Institute lists six factors which tend, when present, to make restraints on alienation reasonable and valid: "1. the one imposing the restraint has some interest in land which he is seeking to protect by the enforcement of the restraint; 2. the restraint is limited in duration; 3. the enforcement of the restraint accomplishes a worthwhile purpose; 4. the type of conveyances prohibited are ones not likely to be employed to any substantial degree by the one restrained; 5. the number of persons to whom alienation is prohibited is small * * *; 6. the one upon whom the restraint is imposed is a charity."[25]

By these accepted standards, the covenants in suit are clearly unreasonable and void considered merely as restraints on the freedom of owners to alienate their property.[26] Of the six favorable factors which the Institute enumerates, (1) only, if any, is present here. (2). The restraint is perpetual. (3). Enforcement of the restraint in this case does not accomplish its purpose of maintaining a white neighborhood and defeats its purpose of increasing the value of the property. Moreover a purpose which, as Buchanan v. Warley[27] holds, legislatures are constitutionally forbidden to accomplish, cannot be · considered a "worthwhile" purpose. Part IV of this opinion is devoted to showing that instead of being worthwhile these covenants do great harm. (4). The "type of conveyances prohibited" would be much "employed * * * by the one[s] restrained," for the record shows that the restricted property can be sold to Negroes for much more than whites will pay for it. ·(5). "The number of persons to whom alienation is prohibited" is enormous. Such persons are more than a quarter of the population of the District of Columbia. In respect to the number of possible purchasers as well as the price which some of them are ready to pay, the landowners' market is most severely as well as permanently impaired. No other sort of restraint of any comparable degree of severity has ever been upheld.

*IV. Public Policy.* Racial restrictive covenants have been defended on two grounds. They are said to increase the value, i. e. the price, of the restricted property, and to prevent racial conflict. If the first proposition is true,[28] which is very doubtful in the District of Columbia,[29] it is no defense of these covenants from the point of view of public policy, but quite the contrary, since the prices of homes are inflated above any level that can be thought socially desirable. The second proposition assumes that racial conflict is likely to result when whites and Negroes live near each other. Familiar facts refute this assumption. In unrestricted areas within the

[24] Am.Law Inst., Restatement of the Law of Property (1944) pp. 2379-80.

[25] Op. cit. § 406, Comment *i*.

[26] Quite inconsistently the Institute, in § 406, Comment *l*, qualifiedly endorses such covenants.

[27] 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149, L.R.A.1918C, 210, Ann.Cas.1918A, 1201; cf. Village of Euclid, Ohio, v. Ambler Realty Co., supra note 15.

[28] Myrdal's general conclusion on this question is that since there is usually a (white) movement out of a neighborhood when Negroes begin to move in, prices usually drop at first, but that they "rise again at least to the level justified by the aging and lack of improvement of the buildings." Op. cit. infra note 36, p. 623. Cf. note 35.

[29] Both in this case and in the Mays case, 79 U.S.App.D.C. 343, 348, 147 F.2d 869, 162 A.L.R. 168 (dissenting opinion), the record shows that the restricted property can be sold to Negroes for much more than whites will pay for it. There is no reason to suppose that this is not typical of the local situation.

economic reach of Negroes, and particularly along the boundaries between restricted and unrestricted areas, whites and Negroes do live near each other and racial conflict does not result. Serious students of the subject believe that enforced housing segregation increases rather than diminishes the possibility of racial conflict.[30] If the satisfaction which many of the whites in restricted areas may derive from excluding Negroes is to be given weight, it must be weighed against the dissatisfaction which Negroes may feel at being excluded.

Any contention that public welfare is on the whole promoted by preventing Negroes from buying homes in white neighborhoods is refuted as a matter of law by Buchanan v. Warley.[31] If it were not "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare"[32] to prevent Negroes from buying homes in white neighborhoods, legislation directed to that end would be due process of law. Buchanan v. Warley determines that it is not due process of law. Since racial restrictive covenants are directed to the same end, it follows that they also do not promote the general welfare. Buchanan v. Warley does not exclude the theoretical possibility that these covenants might be merely neutral in relation to the general welfare. But the fact is that they do great and varied harm, are therefore clearly contrary to public policy, and should be held void for that reason. Moreover the Civil Rights Act discussed in part II of this opinion would be, if it were nothing more, a declaration by Congress that the public policy of the United States forbids preventing Negroes from buying homes because they are Negroes.

The housing shortage in the District of Columbia has long been acute. The shortage of decent housing, or any housing, for Negroes is particularly acute. They are largely confined to wretched quarters in overcrowded ghettoes. These facts are commonly known and undisputed.[33] The correlation of bad and overcrowded housing with delinquency, disease and death has often been proved. The Negro death rate from tuberculosis in the District of Columbia is $4\frac{1}{2}$ times the white, the Negro maternity death rate 5 times the white, and the Negro death rate from all causes 40 percent higher than the white.[34] Though these differences are not due entirely to the in-

---

[30] "Chicago [where segregation prevails] has been an area of racial tension for the past few years and it is generally admitted that there can be no permanent easement of this tension until something fundamental is done about the housing of Negroes in the city." Robert C. Weaver, Race Restrictive Housing Covenants, 20 Journal of Land and Public Utility Economics 183, 187 (1944). Cf. Negro Housing (1932), quoted infra at note 37.

[31] Supra; 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149, L.R.A.1918C, 210, Ann.Cas. 1918A 1201.

[32] Village of Euclid, Ohio, v. Ambler Realty Co., supra note 15.

[33] Cf. note 15 of the dissenting opinion in Mays v. Burgess, 1945, 79 U.S.App. D.C. 343, 350, 147 F.2d 869, 162 A.L.R. 168.

Even in the middle thirties, before the acute housing emergency arose, the National Capital Housing Authority estimated that 14,000 Negro families out of 30,253 were "living under indecent, unsafe and insanitary conditions." Report of the National Capital Housing Authority for the Ten-Year Period 1934–1944, pp. 157, 167.

Between July and November 1946 the Bureau of the Census made a "sample survey" which showed that the "gross vacancy rate" for privately financed dwelling units in the metropolitan area was 1.0 percent in white neighborhoods and 0.4 percent in Negro neighborhoods, and that only "three-fourths of the private vacancies in the area were habitable; of these, only one-sixth were being offered for rent or sale. * * * Approximately one-fourth of the married white World War II veterans and seven-tenths of the married Negro veterans in the Washington area were doubling up with relatives or friends or were living in rented rooms, trailers, or tourist cabins. * * * One-tenth of the married white veterans and two-tenths of the married Negro veterans lived in dwelling units which needed major repairs or lacked one or more standard plumbing facilities—running water, private flush toilet, and private bath." Bureau of the Census, "Survey of World War II Veterans and Dwelling Unit Vacancy and Occupancy in the Washington, D. C., Metropolitan District," Press Release of Feb. 4, 1947.

[34] Report of the Government of the District of Columbia for Year ended June 30, 1946, pp. 115, 117.

feriority of Negro housing no one questions the fact that they are due partly to that cause.

The inferiority of Negro housing is not due entirely to racial covenants, but no one questions the fact that it is due in part to racial covenants. Covenants prevent free competition for a short supply of housing and curtail the supply available to Negroes. They add an artificial and special scarcity to a general scarcity, particularly where the number and purchasing power of Negroes as well as whites have increased as they have recently in the District of Columbia. The effect is qualitative as well as quantitative. Exclusion from decent housing confines Negroes to slums to an even greater extent than their poverty makes necessary. Covenants exclude Negroes from a large fraction—no one knows just how large—of the decent housing in the District of Columbia. Some of it is within the economic reach of some of them. Because it is beyond their legal reach, relatively well-to-do Negroes are compelled to compete for inferior housing in unrestricted areas, and so on down the economic scale. That enforced housing segregation, in such circumstances, increases crowding, squalor, and prices [35] in the areas where Negroes are compelled to live is obvious. It results in " 'doubling up,' scandalous housing conditions for Negroes, destroyed home life, mounting juvenile delinquency, and other indications of social pathology which are bound to have their contagious influence upon adjoining white areas."[36]

Neither the present nor any previous opinion of this court questions or considers these facts. The judgments appear to rest upon the theory that they are unimportant.

As long ago as 1932, when the situation was less acute, the Committee on Negro Housing of the President's Conference on Home Building and Home Ownership said in its Report: "Segregation * * * has kept the Negro-occupied sections of cities throughout the country fatally unwhole-

[35] "No statistical study has been made which shows unequivocally that Negroes pay higher rents for equivalent apartments but this seems to be the opinion of all those—including white real estate agents—who have looked into the matter." Myrdal, op. cit. infra note 36, p. 623. "Not only does there seem to be consensus on the matter among those who have studied the Negro housing problem, but there is also a good logical reason for it: housing segregation. Particularly when the Negro population is increasing in a city, it is hard to see how this factor can fail to make Negro rents increase to an even greater extent than would have been the case if the Negroes had been free to seek accommodations wherever in the city they could afford to pay the rent." Ibid. p. 379. Cf. note 29 supra.

[36] Gunnar Myrdal, An American Dilemma. The Negro Problem and Modern Democracy (1944), p. 626. In 1937 the Carnegie Corporation recognized the need, for use in allocating its own funds and also for general public use, of "a comprehensive study of the Negro in the United States, to be undertaken in a wholly objective and dispassionate way as a social phenomenon," p. ix.

"There was no lack of competent scholars in the United States who were deeply interested in the problem and had already devoted themselves to its study, but the whole question had been for nearly a hundred years so charged with emotion that it appeared wise to seek as the responsible head of the undertaking someone who could approach his task with a fresh mind, uninfluenced by traditional attitudes or by earlier conclusions, and it was therefore decided to 'import' a general director. * * * The search ended in the selection of Dr. Gunnar Myrdal, a scholar who despite his youth had already achieved an international reputation as a social economist, a professor in the University of Stockholm, economic adviser to the Swedish Government, and a member of the Swedish Senate. Dr. Myrdal had a decade earlier spent a year in the United States as a Fellow of the Spelman Fund, and when the invitation was extended to him by the Corporation in 1937, was about to make a second visit at the invitation of Harvard University to deliver the Godkin Lectures. It was understood that he should be free to appoint and organize a staff of his own selection in the United States and that he should draw upon the experience of other scholars and experts in less formal fashion, but that the report as finally drawn up and presented to the public should represent and portray his own decisions." Foreword by F. P. Keppel, then President of the Carnegie Corporation, pp. vi, vii. Dr. Myrdal and a large group of American experts in various fields devoted years of investigation and research to the undertaking which culminated in Dr. Myrdal's 1500-page book.

some places, a menace to the health, morals and general decency of cities, and 'plague spots for race exploitation, friction and riots.' "[37]  Racial restrictive covenants "exist today in thousands of American communities."[38]  Housing segregation may therefore be expected to continue in thousands of communities as long as courts continue to enforce racial restrictive covenants by injunctions.  But "If the Court should follow up its action of declaring all local laws to segregate Negroes unconstitutional by declaring illegal also the private restrictive covenants, segregation in the North would be nearly doomed, and segregation in the South would be set back slightly."[39]

The Charter of the United Nations provides that "the United Nations shall promote * * * universal respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race * * *" and that "all Members pledge themselves to take joint and separate action" for that purpose.[40]  In ruling that racial covenants are contrary to current public policy, a Canadian court relies in part on Canada's adherence to this Charter.[41]  America's adherence to this Charter, the adherence of other countries to it, and our American desire for international good will and cooperation cannot be neglected in any consideration of the policy of preventing men from buying homes because they are Negroes.  In many countries the color of a man's skin is little more important than the color of his hair and in many others the favored color is not white.  In western Europe, to say nothing of other parts of the world, the position of Negroes in America is widely advertised and widely resented.  "Any and all concessions to Negro rights in this phase of the history of the world will repay the nation many times, while any and all injustices inflicted upon him will be extremely costly."[42]  General Eisenhower has said that "enlightened self-interest demands the elimination of the unfair practices against large segments of mankind which, in the past, have so blackened the history of humanity."[43]  The President of the United States has said: "We are living in a time of profound and swiftly moving change. We see colonial peoples moving toward their independence.  It is a process that we, as Americans, can understand and sympathize with, since it parallels our own struggle for independence.  We, as Americans, will want to supply guidance and help

---

[37] Negro Housing (1932), pp. 45, 46.
  "The racial differential in housing accommodations for all income groups combined is enormous. * * * In Detroit 34 per cent of the Negro-occupied dwelling units were considered to be either unfit for use or in need of major repairs; the same proportion for white-occupied dwelling units was 6 per cent.  The corresponding figures for Harrisburg, Pennsylvania, were 73 and 14 per cent, respectively.  For Norfolk, Virginia, they were 25 and 5 per cent; for Savannah, Georgia, 55 and 11 per cent. * · * * The differential is quite considerable in almost every place where there is an appreciable Negro population."  Myrdal, op. cit. supra note 36, p. 378.
  "While less than eight per cent of the dwelling units occupied by urban whites were overcrowded, almost 25 per cent of the units occupied by urban Negroes were overcrowded. * * * Congestion in Negro neighborhoods has reached a new high, and it is extracting unheard of economic and social costs.  The situation has led to greater frustration of the hemmed-in inhabitants since a large number of them have, for the first time, enough money to pay for decent shelter.  Residential segregation prevents them from getting it on equal terms with other Americans and looms as a permanent impediment for most of them."  Robert C. Weaver, Housing in a Democracy, Annals of the American Academy of Political and Social Science, March 1946, pp. 95-96.
  [38] Robert E. Cushman, The Laws of the Land, 36 Survey Graphic 14, 17 (1947).
  "The restrictive covenant * * * has been popular, especially in the North.  The exact extent of the use of the restrictive covenant has not been ascertained, but: 'in Chicago, it has been estimated that 80 per cent of the city is covered by such agreements. * * *' "  Myrdal, op. cit. supra note 36, p. 624.
  [39] Myrdal, op. cit. supra note 36, p. 624.
  [40] Articles 55c, 56.
  [41] Re Drummond Wren, [1945] 4 D.L. R. 674 (Ontario High Court).
  [42] Myrdal, op. cit. supra note 36, p. 1015.
  [43] New York Times, Feb. 24, 1947.

wherever we can. One way in which we can help is to set an example of a nation in which people of different backgrounds and different origins work peacefully and successfully alongside one another. * * * More and more we are learning, and in no small measure through the medium of the press, how closely our democracy is under observation. We are learning what loud echoes both our successes and our failures have in every corner of the world. That is one of the pressing reasons why we cannot afford failures. When we fail to live together in peace, the failure touches not us, as Americans, alone, but the cause of democracy itself. That we must never forget."[44]

Suits like these, and the ghetto system they enforce, are among our conspicuous failures to live together in peace. In another such suit, this court recently argued that "if ever the two races are to meet upon mutually satisfactory ground, it cannot be through legal coercion * * *."[45] This premise, instead of supporting the court's conclusion that racial restrictive covenants should be enforced by injunctions, is one more argument against it. The question in these cases is not whether law should punish racial discrimination, or even whether law should try to prevent racial discrimination, or whether law should interfere with it in any way. The question is whether law should affirmatively support and enforce racial discrimination. Appellants do not ask that appellees be forced to sell them houses. Appellees alone have come into court with a claim. They ask the court to take away appellants' homes by force because they are Negroes. There is no other issue in the case.

[44] Remarks of the President in making the Wendell Willkie Awards for Journalism; Press Release, Feb. 28, 1947.

[45] Mays v. Burgess, 79 U.S.App.D.C. 343, 347, 147 F.2d 869, 873, 162 A.L.R. 168.